IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT ESENWEIN, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 4:17CV3790 |
| vs. | § | |
| | § | |
| CARDNO, INC. | § | |
| | § | |
| *Defendant*. | § | |

## DEFENDANT CARDNO, INC.'S MOTION FOR SUMMARY JUDGMENT

*Of counsel*:
Karmyn W. McCloud
State Bar No. 24084063
Federal I.D. No. 2108020
LITTLER MENDELSON, PC
1301 McKinney Street
Suite 1900
Houston, TX 77010
713.951.9400 (Telephone)
713.951.9212 (Telecopier)
kmccloud@littler.com

Kerry E Notestine (Attorney-in-Charge)
State Bar No. 15116950
Federal I.D. No. 2423
LITTLER MENDELSON, PC
1301 McKinney Street
Suite 1900
Houston, TX 77010
713.951.9400 (Telephone)
713.951.9212 (Telecopier)
knotestine@littler.com

ATTORNEYS FOR CARDNO, INC.

## TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF THE CASE ........................................................1

II.   STATEMENT OF THE ISSUES AND STANDARD OF REVIEW ...........1

    A.    Issues to be Ruled on by the Court.....................................................1

    B.    Standard of Review ............................................................................2

III.  SUMMARY OF THE ARGUMENT ........................................................2

IV.   RELEVANT FACTUAL BACKGROUND .............................................3

    A.    Esenwein's Employment at Cardno ....................................................3

    B.    Esenwein Disputes an Email that Martin Proposed Sending to a
          Client .................................................................................................3

    C.    Esenwein Reported Concerns of Harassment and Retaliation.............7

    D.    Houston's NRHS Staff Members Made a Complaint Against
          Esenwein ...........................................................................................9

V.    ARGUMENTS AND AUTHORITIES ....................................................11

    A.    Esenwein Cannot Prove he was Required to Commit an Act............11

    B.    Esenwein Cannot Show that the Act in Question was Illegal............13

        1.    Esenwein was Not Required to Commit a Deceptive
              Trade Practice Offense under Section 32.42 (b)(12)(B)..........13

        2.    Esenwein Was Not Required To Commit Mail Fraud.............15

    C.    Esenwein Cannot Prove that He was Fired for the Sole Reason
          of Refusing to Commit an Illegal Act ...............................................17

VI.   CONCLUSION.........................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994) .................................................................... 2

*United States v. Davis*,
  752 F.2d 963 (5th Cir. 1985) ............................................................. 13, 15

*White v. FCI USA, Inc.*,
  319 F.3d 672 (5th Cir. 2003) ................................................................... 11

**State Cases**

*Austin v. Healthtrust, Inc.*,
  967 S.W.2d 400 (Tex. 1998) .................................................................... 19

*Burt v. City Burkburnett*,
  800 S.W.2d 625 (Tex.App.—Fort Worth 1990, writ denied) ........................... 12, 13

*Ely v. State*,
  582 S.W.2d 416 (Tex. Cri. App.1979) ....................................................... 15

*Guerra v. Datapoint Corp.*,
  956 S.W.2d 653 (Tex.App.—San Antonio 1997) ....................................... 13

*Ran Ken, Inc. v. Schlapper*,
  963 S.W.2d 102 (Tex. App.—Austin 1998, no writ.) ............................... 17

*Sabine Pilot Serv. v. Hauck*,
  687 S.W.2d 733 (Tex. 1985) ............................................................... *passim*

*Tex. Dept. of Human Serv. v. Hinds*,
  904 S.W.2d 629 (Tex. 1995) .................................................................... 18

*Winters v. Houston Chronicle Publ'g*,
  795 S.W.2d 723 (Tex. 1990) .................................................................... 12

**Federal Statutes**

18 U.S.C. § 1341 .................................................................... 1, 11, 13, 15

**State Statutes**

Texas Penal Code § 32.42 (b)(12)(B) ............................................................ 1, 11, 13, 14

**Rules**

Federal Rule of Civil Procedure 56 ........................................................................ 1, 2

In accordance with Rule 56 of the Federal Rules of Civil Procedure, Defendant Cardno, Inc. ("Cardno") moves for summary judgment on Plaintiff Robert Esenwein's *Sabine Pilot* claim, as follows:

## I.    NATURE AND STAGE OF THE CASE

On December 29, 2017, the plaintiff, Robert Esenwein (Esenwein)—a former employee of Cardno—filed this lawsuit alleging that Cardno violated the rule of law established in *Sabine Pilot Serv. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985) in that Cardno terminated his employment for refusing to commit fraud.  *See* Dkt. No. 1. On March 14, 2018, Esenwein amended his Complaint by alleging that the fraud he was requested to commit violated Section 32.42 (b)(12)(B) of the Texas Penal Code and 18 U.S.C. § 1341.  *See* Dkt. No. 9, at ¶ 10.  Since then, the parties have exchanged written discovery, Cardno deposed Esenwein, and Esenwein deposed Cardno's Human Resources Business Partner, Denise Decker. Discovery closed on January 8, 2019.  Docket call is currently set for the May/June 2019 term.  *See* Dkt. No. 17.  The dispositive motion deadline is February 1, 2019. *Id.* This case is ripe for disposition.

## II.    STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

### A.    ISSUES TO BE RULED ON BY THE COURT

Cardno requests that the Court rule upon the following issues: whether Esenwein can demonstrate a genuine issue of material fact that Cardno directed

1

him to commit an criminal act, and terminated his employment for solely refusing to commit an criminal act.

### B.   STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## III.   SUMMARY OF THE ARGUMENT

Cardno is entitled to summary judgment because Esenwein is unable to present evidence to establish the existence of genuine issues of material facts as to his *Sabine Pilot* claim.   Particularly, Esenwein cannot establish that Cardno required him to commit any criminally illegal act, including a deceptive trade practice offense and mail fraud.   Furthermore, Esenwein cannot prove that Cardno terminated his employment solely for refusing to commit a criminally illegal act. Because the undisputed summary judgment evidence shows that Esenwein cannot establish the elements to prove his claim, Esenwein's *Sabine Pilot* claim should be dismissed.

IV.    RELEVANT FACTUAL BACKGROUND

    A.    ESENWEIN'S EMPLOYMENT AT CARDNO

Cardno provides environmental consulting services to numerous industries globally.  Ex. 1, Deposition Transcript of Robert Esenwein at 123:25-124:17.  Ex. 2, Declaration of Chad Martin at ¶ 4.  On March 18, 2014, Esenwein began working at Cardno as a Senior Consultant in the Natural Resources & Health Sciences Division (NRHS).  Ex. 1 at 317:2-7.  As a Senior Consultant, Esenwein was responsible for developing new business and maintaining existing clients for the Houston office.  *Id.* at 113:17-114:15; Ex. 3, Offer Letter.  He was also expected to mentor less experienced staff.  Ex. 3.  Esenwein reported directly to Chad Martin (Martin), Project Director, Principal of the Science & Environment Division.[1]  Ex. 1 at 20:7-9; Ex. 2 at ¶ 2 .

    B.    ESENWEIN DISPUTES AN EMAIL THAT MARTIN PROPOSED SENDING TO A CLIENT

In December 2015, Martin was introduced to the president of InSite Educational Facility Services (InSite), Benson Sainsbury (Sainsbury). Ex. 2 at ¶ 5. InSite is a real estate firm that assists school districts and charter schools with land acquisition.  *Id.*; Ex. 1 at 138:18-23.  Once a district or charter school selects an area of land to build upon, InSite contracts with companies, like Cardno, to complete environmental due diligence and perform biological and other

---

[1] At the time of Esenwein's employment, the Science & Environment Division was called the Natural Resources and Health Sciences Division. Ex. 2 at ¶ 2.

assessments on the land.  Ex. 2 at ¶ 5.  In light of their respective businesses'
services, Martin and Sainsbury believed there were opportunities for Cardno and
InSite to collaborate and partner on projects, and therefore, they began working
together by exchanging contacts and identifying potential projects.  *Id.* at ¶ 5.
Thus, on December 18, 2015, Martin emailed his direct supervisor, Mike Rudd
(Rudd), former South West Business Manager of the NRHS Division, and
Esenwein about a meeting Martin had with Sainsbury and relayed that Sainsbury
was going to introduce Martin to one of Sainsbury's contacts in Texas.  *Id.* at ¶ 6;
Ex. 1 at 136:10-12; Ex. 4, 12.18.15 Email re Marketing.  In return, Martin
indicated that he would make an introduction to one of Cardno's education clients,
Conroe Independent School District (Conroe ISD) or a similar contact.  Ex. 2 at ¶
6; Ex. 4.

Following up on his December 18 email, on December 21, 2015, Martin sent
Esenwein a draft of an email Martin planned on sending to Sainsbury regarding the
introduction to Conroe ISD.  Ex. 2 at ¶ 7; Ex. 1 at 143:15-144:11; Ex. 5, 12.21.15,
Proposed Email to InSite.  Martin sent the proposed email to Esenwein because
Esenwein was Cardno's contact for Conroe ISD and Martin wanted Esenwein to be
aware of the proposed introduction to Conroe ISD as a courtesy.  Ex.1 at 139:9-15;
Ex. 2 at ¶ 7.  Yet, Martin was the one who was sending the proposed email, not

4

Esenwein; thus, at the very beginning of the draft email, Martin asked Esenwein if

he was "okay" with the following:

> Benson, these are the folks we work with at Conroe ISD. I will need to dig up a phone number for Easy Foster. If you reach out you may tell them that we (Cardno) work with you on other 'school' ventures around the state of a similar nature and that we could offer a more seamless transition from land acquisition to development.
>
> Robert Esenwien [sic] in our Houston Office is the main contact for us.

Ex. 1 at 143:22-145:1, 146:1-17; 220:8-15; Ex. 2 at ¶ 7; Ex. 5. Then, Martin

provided the contact information for two individuals at Conroe ISD. Ex. 5.

Esenwein responded by asking Martin whether Cardno works with InSite.

Ex. 1 at 139:139:24-25; Ex. 6, 12.21.15 Esenwein's Response Email. Martin

responded that Cardno did not yet, but there were prospective opportunities. Ex. 7,

12.21.15, Martin's Response Email. Shortly after that, Martin called Esenwein to

explain that although InSite and Cardno had not formally contracted on a project

together, he (Martin) had been working with Sainsbury on prospective projects.

Ex. 2 at ¶ 8. Esenwein alleges that Martin then asked if Esenwein would schedule

a face-to-face meeting with Conroe ISD. Ex. 1 at 139:9-11; 222:12-14. Esenwein

also alleges that Martin wanted him to tell Conroe ISD that Cardno and InSite had

a longstanding, working relationship and that InSite did great work. Ex. 1 at

139:16-22. Esenwein, who did not even consider whether there was anything

criminal regarding Martin's email or statement, declined to make the introduction

because he felt it was morally wrong.  Ex. 1 at 140:9-13, 141:17-19, 21-25, 142:1-8.  Consequently, Martin revised the proposed email because of Esenwein's objections, then decided not to send any email to InSite regarding Conroe ISD.  Ex. 2 at ¶ 8.

The next day, on December 22, 2015, Esenwein reported to Cardno's General Counsel, Michael Pearson (Pearson), that he "was being requested to attesting that Cardno works with a company that it does not work with."  Ex. 1 at 151:19-152:6; Ex. 8, 12.22.15, Email to Pearson.  Esenwein expressed that he disagreed with referring a company to a Cardno client without having any work experience with that company.  Ex. 1 at 154:20-156:4; Ex. 8.  Additionally, he expressed concerns of retaliation since he was unwilling to go along with the email.  *Id.*

Pearson instructed Esenwein to report his concerns to his division manager, David Blankenhorn (Blankenhorn), former Executive Vice President of the NRHS Division.  Ex. 1 at 157:21-158:12; Ex. 9, Response Email from Pearson.  Esenwein subsequently reported his concerns to Blankenhorn, and the report was referred to Denise Decker (Decker), Human Resources Business Partner for the NRHS Division.  Ex. 1 at 162:8-25, 163:8-13; Ex. 10, Declaration of Denise Decker at ¶ 3.  Decker promptly investigated Esenwein's concerns.  *Id.* at ¶¶ 3-4.  On December 23, 2015, Decker interviewed both Esenwein and Martin regarding the

email.  *Id.* at ¶ 3; Ex. 1 at 163:19-22.  Based on her interviews, Decker concluded that there was a miscommunication between Esenwein and Martin.  Ex. 10 at ¶ 3. Particularly, Esenwein believed he was being asked to falsify a client relationship, Decker, however, concluded that Martin intended to exaggerate or inflate an existing relationship.  *Id.*  Though this conduct was inappropriate, no one had any reason to believe that it was criminally illegal or that Martin had any criminal intent. Ex. 1 at 141:17-19, 21-25, 142:1-8; Ex. 2 at ¶ 9; Ex. 10 at ¶ 3.

Nevertheless, Decker and Rudd met with Martin to speak about the severity of the situation. Ex. 10 at ¶ 3.  They also reminded Martin of Cardno's policy prohibiting retaliation and instructed him to take no actions against Esenwein because of Esenwein's report.  *Id*.  Martin acknowledged his understanding on the Company's anti-retaliation policy.  Ex. 2 at ¶ 9.  Afterwards, Decker emailed Esenwein that the investigation was closed and that there would be no retaliation based on his reported concerns.  Ex. 1 at 164:7-20; Ex. 10 at ¶ 4; Ex. 11, Email Closing Case.  In addition, Decker instructed Esenwein to contact her if he felt that he was being subjected to retaliation.  *Id*.

C.   ESENWEIN REPORTED CONCERNS OF HARASSMENT AND RETALIATION

A few weeks later, on January 8, 2016, Esenwein made a complaint of harassment to Decker about former Senior Project Scientist Manager Brandon Wieme (Wieme).  Ex. 1 at 174:11-24; Ex. 12, Esenwein's Harassment Complaint.

7

Esenwein complained that Wieme made several comments about the volume of work being unsustainable for the NRHS staff in the Houston.  Ex. 1 at 130:4-131:3, 174:25-182:10; Ex. 12.   Esenwein reported that he believed that Wieme made these comments because of Esenwein's complaint against Martin.  Ex. 1 at 131:2-3; Ex. 12.  Esenwein also complained that Martin had scheduled meetings with the NRHS Division staff without notifying or inviting Esenwein to the meetings.  Ex. 1 at 184:4-185:4; Ex. 13, Esenwein's Follow-up Complaint.

Decker promptly addressed Esenwein's concerns.  Ex. 10 at ¶¶ 5-6.  She advised Esenwein to speak with Wieme about the comments he claimed Wieme made.  *Id*. at ¶ 6; Ex. 1 at 185:5-7, 187:5-19; 188:4-8.  Esenwein did so and acknowledged that Wieme's comments had nothing to do with Esenwein's complaint against Martin, but rather, Wieme was concerned about the industry and the availability of work.  Ex. 1 at 189:11-190:6; Ex. 10 at ¶6; Ex. 14, Email Regarding Conversation with Wieme.  Esenwein reported back to Decker that he resolved his concerns regarding Wieme.  Ex. 1 at 190:23-14; Ex. 14.  As for the allegations about Martin scheduling NRHS meetings without Esenwein, Decker recommended to Rudd that he visit the Houston office to address Esenwein's and Martin's working relationship.  Ex. 10 at ¶ 6.

On or about January 13, 2016, Rudd visited Houston and met with Martin and Esenwein.  Ex. 2 at ¶ 10; Ex. 15, Rudd's Summary of Visit.  During that visit,

Rudd discussed their working relationship and practices for including Esenwein in meetings with the NRHS staff in Houston.  Ex. 1 at 62:13-20, 207:20-208:4; Ex. 2 at ¶ 10; Ex. 15.  Rudd also discussed formally making Esenwein the Houston Branch Manager.  *Id.*; Ex. 1 at 207:13-18; Ex. 15.  Furthermore, Rudd reiterated the Company's prohibition against any retaliation for Esenwein's December report and assigned Martin several on-line trainings through the Company's intranet as corrective action related to Esenwein's complaint.  Ex. 2 at ¶ 10; Ex. 15.  The trainings were: (1) Anti-Harassment; (2) Business Law and Ethics; and (3) Ethics, Integrity and Trust.  Ex. 2 at ¶ 10.  Martin completed all the trainings.  *Id*. After Rudd's visit to Houston, he contacted Decker and suggested that she follow-up with the Houston office because there were underlying issues related to their work environment.  Ex. 10 at ¶ 7.

 D.  HOUSTON'S NRHS STAFF MEMBERS MADE A COMPLAINT AGAINST ESENWEIN

Shortly after Rudd's comment about the work environment in the Houston office, Gretchen Gotlieb (Gotlieb) complained to Martin that Esenwein was demeaning to staff and that the female staff members were afraid to come to work. Ex. 2 at ¶ 11; Ex. 16, Declaration of Gretchen Gotlieb at ¶ 3.  Though Martin was the formal supervisor of the Houston office, he relayed the concerns to Rudd instead of handling it himself because of his recent incident with Esenwein. Ex. 2 at ¶ 11.  Rudd, then, referred the complaint to Decker. *Id.*; Ex. 10 at ¶ 8.  Decker

investigated the concerns and excluded Martin from any participation in the investigation or in the decision making process and worked, primarily, with Rudd. *Id*. Decker first interviewed Gotlieb, Kristen Ramsey (Ramsey), Rebecca Gregg (Gregg).  *Id.* at ¶ 9; Ex. 19, Investigation File.  After having those three interviews, she realized the reported comments and/or conduct was not gender-related and therefore, she scheduled a meeting with Wieme. Ex. 10 at ¶ 9.  All of the reported comments corroborated the initial complaint.  *Id.* Specifically, their comments revealed the following:

- ▪ Esenwein regularly spoke to staff in a condescending, demeaning, and belittling manner;

- ▪ Esenwein was unapproachable and did not mentor junior staff, and as a result, the junior staff were inefficient on projects because they were afraid to ask Esenwein for assistance or guidance when needed;

- ▪ Esenwein was confrontational and rejected any discussion of opinions or ideas that differed from his own;

- ▪ Esenwein terrified the staff;

- ▪ Some of the staff members were afraid to come to work;

- ▪ Esenwein instructed Gregg and Ramsey to misrepresent their time regarding projects; and

- ▪ The staff feared that Esenwein would either retaliate or behave worse because they participated in Decker's investigation.

Ex. 10 at ¶¶ 9-10; Ex. 16 at ¶ 4; Ex. 17, Declaration of Rebecca Gregg at ¶¶ 3-4; Ex. 19.  Based on these comments, Decker concluded Esenwein's behavior created a hostile work environment.  Ex. 10 at ¶ 11.  Consequently, she, Rudd and

10

Blankenhorn decided to terminate Esenwein's employment on February 9, 2016. *Id.* at ¶ 11; Ex. 18, Termination Notice.

## V.    ARGUMENTS AND AUTHORITIES

Esenwein's *Sabine Pilot* claim hinges on: (1) Martin's question to Esenwein if he was "okay" with the proposed email to Sainsbury; (2) Martin's subsequent request to relay to Conroe ISD that Cardno had a longstanding, working relationship with InSite; and (3) Esenwein's termination for refusing to perform either act.  Dkt. No. 9 at ¶ ¶ 6-7, and 9.  Esenwein claims that the requested acts violated the Texas Penal Code, Section 32.42(b)(12)(B) (a deceptive trade practice offense) and 18 U.S.C. § 1341 (mail fraud).  Dkt. No. 9, at ¶ 10.  To succeed on his claim, Esenwein must show that: (1) he was required to commit an illegal act carrying criminal penalties; (2) he refused to engage in the illegal act; (3) he was discharged; and (4) the sole reason for his discharge was his refusal to commit the illegal act.  *White v. FCI USA, Inc.*, 319 F.3d 672, 676 (5th Cir. 2003).  Esenwein's claim fails because he is unable to create any genuine issue of material fact that he was required to commit any illegal act or that he was terminated solely because of his refusal to perform that act.

### A.    ESENWEIN CANNOT PROVE HE WAS REQUIRED TO COMMIT AN ACT

To come within the *Sabine Pilot* exception, Esenwein "must be unacceptably forced to choose between risking criminal liability or being discharged."  W*hite*,

319 F.3d 672 at 676-677; *Winters v. Houston Chronicle Publ'g*, 795 S.W.2d 723, 724 (Tex. 1990). That means Esenwein must demonstrate that Cardno required, not just requested, him to commit an unlawful act. *Burt v. City Burkburnett*, 800 S.W.2d 625, 627 (Tex.App.—Fort Worth 1990, writ denied). Esenwein cannot do so. In the proposed email, Martin did not require, direct, or instruct Esenwein to make any statement to Conroe ISD. Ex. 1 at 143:22-145:1, 146:1-17, 220:8-15; Ex. 2 at ¶ 7; Ex. 5. In fact, Martin did not ask Esenwein to do anything. *Id.* The email unequivocally shows that Martin was the one sending the email and therefore, providing the statements contained in it. Ex. 1 at 143:22-145:1, 146:1-17; Ex. 5; Ex. 2 at ¶ 5. More importantly, Martin specifically asked Esenwein whether he was "okay" with the email, which undercuts any suggestion that Martin *required* Esenwein to agree with statements in the email. Ex. 144:25-145:1; Ex.5. Moreover, Martin revised the email after Esenwein expressed his discomfort with the proposed email but never sent it. Ex. 2 at ¶ 8; Ex. 1 at 146:18-147:5. This further supports that Esenwein was not required to commit any criminal act.

Even assuming Martin asked Esenwein to relay to Conroe ISD that Cardno had a longstanding, working relationship with InSite, Esenwein admitted that Martin simply *wanted* him to make that statement. Ex. 1 at 139:16-22, 222:9-14. Thus, merely wanting or asking Esenwein to make that statement falls far short of the standard to establish a *Sabine Pilot* claim. *Burt*, 800 S.W.2d at 627. Indeed,

Esenwein must demonstrate that Cardno required, not just requested, him to commit an unlawful act. *Id.* Thus, the summary judgment evidence undisputedly negates that Esenwein was required to commit any illegal act or face discharge. Consequently, his claim fails as a matter of law.

B.   ESENWEIN CANNOT SHOW THAT THE ACT IN QUESTION WAS ILLEGAL

Even if Martin allegedly required Esenwein to commit some type of act, Esenwein still cannot prevail on his *Sabine Pilot* claim because these actions do not violate Section 32.42 (b)(12)(B) of the Texas Penal Code or 18 U.S.C. § 1341. To commit a deceptive trade practice under Section 32.42 (b)(12)(B), a person must make a materially false or misleading statement in connection with the purchase or sale of property or service. *See Guerra v. Datapoint Corp.*, 956 S.W.2d 653, 658 (Tex.App.—San Antonio 1997); TEX. PENAL CODE § 32.42 (b)(12)(B). In turn, to commit mail fraud, there must be: (1) a devised scheme to defraud; and (2) usage of the Postal Service or any private or commercial interstate carrier to execute or attempt to execute the scheme. *See* 18 U.S.C. § 1341; *United States v. Davis*, 752 F.2d 963, 970-71 (5th Cir. 1985).

1.   Esenwein was Not Required To Commit s Deceptive Trade
Practice Offense under Section 32.42 (b)(12)(B).

Esenwein cannot establish that the alleged statement constitute a violation of Section 32.42 (b)(12)(B) because neither the statement in Martin's proposed email nor the statement Martin allegedly asked Esenwein to make was in connection with

13

a purchase or sale of any service or property. [2]  Ex. 2 at ¶ 7; Ex. 4; Ex. 5.   In his December 18 email, Martin specifically stated that he wanted to introduce InSite to Conroe ISD or to a contact in education as a favor in return for Sainsbury introducing Martin to a contact.  Ex. 4.  On December 21, 2015, Martin, again, reiterated to Esenwein that he simply wanted to make an introduction.  Ex. 1 at 139:9-11, 220:8-15; Ex. 2 at ¶¶6-8.  There was no sale or purchase of any services or property pending at this time.  Ex. 2 at ¶ 7.  Thus, the evidence undisputedly shows that the proposed email was solely in connection with an introduction between InSite and Conroe ISD.  As a result, the alleged statements do not violate Section 32.42 (b)(12)(B) of the Deceptive Trade Practice Act.

Esenwein has no evidence to suggest that a sale or purchase of services was pending at the time Martin intended to make the alleged statement.   Indeed, Esenwein admitted that he was unaware of Martin's and Sainsbury's intentions or discussions. Ex. 1 at 146:7-12.  Despite Esenwein's allegations that Martin wanted him to make the introduction so that Conroe ISD would *eventually* hire InSite to perform services, at the time of the statements in question, Esenwein conceded that the requested statements were in merely connection with an introduction.  Ex. 1 at 137:13-138:1,  139:16-22,  220:12-221:5;  Ex.  2  at  ¶¶6-8.   For  these  reasons,

---

[2] Cardno does not concede that the alleged statement in Martin's proposed email or regarding Cardno's working relationship with InSite is materially false or misleading; but for purposes of this motion for summary judgment, Cardno does not move on that basis.  Nevertheless, the requested statement does not constitute a deceptive trade practice under Section 32.42(b)(12)(B) of the Texas Penal Code because as discussed above the purported statement was not in connection with a sale or purchase of service or property.

Esenwein cannot demonstrate he was required to commit a deceptive trade practice offense. *See Ely v. State*, 582 S.W.2d 416, 420 (Tex. Cri. App.1979) (the culpable mental state must attach to the making of the "materially false or misleading statement at the time of "the purchase or sale of property or service.").

### 2.     Esenwein was Not Required to Commit Mail Fraud

In addition, Esenwein cannot demonstrate that he was required to commit mail fraud. The statement, fraudulent or otherwise, was not conducted through the Postal Service or any private or commercial interstate carrier but by electronic mail. Ex. 1 at 137:13-138:1, 139:16-22, 220:12-221:5; Ex. 5; Ex. 2 at ¶6-8. This alone is fatal to Esenwein's contention that the requested act violated federal mail fraud laws because the postal service or private or commercial interstate carrier must be used at some point to further the scheme. *See* 18 U.S.C. § 1341; *United States v. Davis*, 752 F.2d at 970-71.

Furthermore, other than Esenwein's subjective beliefs that the alleged statement about Cardno and InSite's relationship was deceitful, there is no evidence that Martin devised any scheme to defraud Conroe ISD. Ex. 1 at 144:25-145:1, 164:23-165:2; Ex. 2 at ¶¶6-9; Ex. 10 at ¶ 3. The email thread, which Martin forwarded to Esenwein, expressly shows that Martin and Sainsbury believed that there could be opportunities for their respective companies to collaborate on projects. Ex. 145:7-146:17; Ex. 2 at ¶¶6-9; Ex. 5. Because of the synergies

between the two companies, Sainsbury and Martin exchanged contact information with each other.  *Id*.  The email, which the purported fraudulent statement stems from, is simply Martin forwarding contact information to Sainsbury.  Ex. 2 ¶¶ 6-8; Ex. 5.  Even if the statement about Cardno's working relationship with InSite was not completely accurate, there is no "scheme or plan" by Martin or Sainsbury to defraud Conroe ISD.  Ex. 2 at ¶ 5; Ex. 5.  Indeed, just a few days before the statements in question, Martin emailed Esenwein and Rudd and communicated to them that he planned to introduce InSite to Conroe ISD or a similar contact in education because Sainsbury planned on introducing Martin to one of InSite's contacts.  Ex. 4; Ex. 5.  Thus, the evidence undisputedly shows that Martin's actions amount to nothing more than mere networking, not a plan to defraud anyone.  Ex. 2 at ¶¶ 6-9; Ex. 4; Ex. 5.  Accordingly, Esenwein cannot establish that he was required to commit mail fraud.

Esenwein has no evidence to present a genuine issue of material fact that he was required to commit a deceptive trade practice offense, mail fraud or any other act carrying criminal penalties.  Esenwein conceded that he was not aware of anything illegal with Martin's statement or intentions.  Ex. 1 at Ex. 145:7-146:17.  This is distinguishable from the seminal *Sabine Pilot* case, where the employee unequivocally knew that the requested act was illegal because he had seen a sign criminalizing the act.  *Sabine Pilot Serv*, 687 S.W.2d at 734.  Esenwein, on the

16

other hand, only refused because he believed, subjectively, that it was morally wrong.  Ex. 1 at 140:9-13, 141:17-19, 21-25, 142:1-8.  Esenwein's subjective beliefs are insufficient to establish a *Sabine Pilot* claim.  *See Ran Ken, Inc. v. Schlapper*, 963 S.W.2d 102, 105 (Tex. App.—Austin 1998, no writ.) (an employee who cannot show that performance of the requested act would result in criminal penalties against him will not meet the burden of proof necessary to succeed in a *Sabine Pilot* cause of action.).  For this reason, Esenwein's claim should be dismissed.

C.   ESENWEIN CANNOT PROVE THAT HE WAS FIRED FOR THE SOLE REASON OF REFUSING TO COMMIT AN ILLEGAL ACT

The summary judgment record negates any inference that Esenwein's termination was based solely on his refusal to agree with Martin's proposed email to Sainsbury or to introduce InSite to Conroe ISD.  Particularly, Rudd raised concerns about the Houston office having underlying issues and suggested that Decker "look into" them.  Ex. 10 at ¶7.  Then, shortly after Rudd expressed his observations, Gotlieb complained to Martin that the female staff members were afraid to come to work and that Esenwein was demeaning in his communication and/or management style.  Ex. 2 at ¶ 11; Ex. 16 at ¶ 3.  Martin relayed the complaint to Rudd, and HR investigated the complaint.  Ex 2 at ¶ 11; Ex. 10 at ¶ 8.  As part of the investigation, Decker interviewed four individuals, all of whom commented that Esenwein regularly spoke to staff in a condescending, demeaning,

and belittling manner; rejected any discussion of opinions or ideas that differed
from his own; was unapproachable and did not mentor junior staff; terrified staff so
that they were afraid to come to work; and instructed members to misrepresent
their time regarding projects.  Ex. 10 at ¶¶ 9-10; Ex. 16 at ¶ 4; Ex. 17 at ¶¶ 3-4; Ex.
19.  Notably, nearly of all the individuals interviewed reported concerns of fear
that Esenwein would either retaliate or behave worse because they participated in
Decker's investigation.  Ex. 10 at ¶ 9; Ex. 16 at ¶ 4; Ex. 19.  This inappropriate
conduct, alone, is a legitimate reason for terminating Esenwein's employment, and
therefore, his *Sabine Pilot* claim fails as a matter of law.  *See Tex. Dept. of Human
Serv. v. Hinds,* 904 S.W.2d 629, 633 (Tex. 1995) (An employer who discharges an
employee both for refusing to perform an illegal act and for a legitimate reason
cannot be liable for wrongful discharge).

Esenwein cannot show that he was terminated for the sole reason that he
refused to perform an illegal act.  Essentially all of Esenwein's transactions were
with Gotlieb, Gregg, and Ramsey; thus, Decker had no reason to believe the
reported comments were false. Ex. 1 at 239:16-19.  Even more, Esenwein admitted
he previously had an incident regarding his communication with Gregg before the
incident with Martin. Ex. 1 at 197:3-15. Furthermore, neither Gregg nor Gotlieb
were aware of the incident between Martin and Esenwein.  Ex.16 at ¶ 5; Ex. 17 at ¶
5. And, Esenwein has no evidence that Martin, Decker, or Rudd disclosed the

details of Esenwein's complaint against Martin to the other staff in the Houston office. Ex. 1 at 202:7-19; Ex. 13. Moreover, Esenwein has no evidence that the decision-makers—Decker or Rudd—had any negative or retaliatory animus toward him. Ex. 1 at 235:11-18, 22-25, 236:4-17. In fact, the record demonstrates they did not. Particularly, Decker assured Esenwein, repeatedly, that he would not be subject to retaliation. Ex. 10 at ¶ 4; Ex. 12. Decker also promptly addressed Esenwein's concerns of harassment and retaliation. Ex. 1 at 188:4-8; Ex. 10 at ¶¶ 4-5; Ex. 14. Even more, Decker completely removed Martin from any involvement in the investigation or in the decision making process. Ex. 10 at ¶ 8. Furthermore, Rudd formally announced that Esenwein would be the Branch Manager of the Houston office *after* Esenwein refused to commit the alleged illegal act. Ex. 1 at 207:13-208:4; Ex. 15. This, alone, refutes any inference that Rudd terminated Esenwein's employment for his refusal for committing the alleged acts as it is nonsensical that Rudd would promote Esenwein if Rudd harbored any negative or retaliatory animus toward Esenwein. At most, Esenwein believes he was terminated for *making* a complaint against Martin. Ex. 1 at 198:21-19, 236:21-25. However, the *Sabine Pilot* exception does not protect a plaintiff who is discharged for reporting illegal activities. *Austin v. Healthtrust, Inc.*, 967 S.W.2d 400, 403 (Tex. 1998). Accordingly, Cardno is entitled to summary judgment.

19

## VI.   CONCLUSION

For the foregoing reasons, Cardno is entitled to summary judgment on Esenwein's *Sabine Pilot* wrongful termination claim.

Dated: February 1, 2019

Respectfully submitted,

/s/ Kerry E Notestine
Kerry E Notestine (Attorney-in-Charge)
State Bar No. 15116950
Federal I.D. No. 2423
LITTLER MENDELSON, PC
1301 McKinney Street
Suite 1900
Houston, TX  77010
713.951.9400 (Telephone)
713.951.9212 (Telecopier)
knotestine@littler.com

ATTORNEYS FOR CARDNO, INC.

*Of counsel*:

Karmyn W. McCloud
State Bar No. 24084063
Federal I.D. No. 2108020
LITTLER MENDELSON, PC
1301 McKinney Street
Suite 1900
Houston, TX  77010
713.951.9400 (Telephone)
713.951.9212 (Telecopier)
kmccloud@littler.com

## CERTIFICATE OF SERVICE

I certify that on February 1, 2019, I served a copy of the foregoing document to the following counsel of record via the clerk's electronic filing system addressed as follows:

Davis Holmes
13201 Northwest Freeway, Suite 800
Houston, Texas 77040
Dholmes282@aol.com

ATTORNEY FOR PLAINTIFF

/s/ Karmyn McCloud
Karmyn McCloud

20